NCR Corporation, Inc. The claim is not required to answer every question about how to enable it. What's happened here is that the arguments that have come in in opposition here by the appellee involve looking at what details are not present in the claim. How do we determine what a signature is? Can a block be a signature? The answer is the bank sets its parameters. And as long as the bank is applying whatever those parameters are to determine whether there's a signature present on the check, then the bank meets the claim. I wanted to address one more issue on the issue of an apparent signature. What NCR has done is that rather than construe the entire term ascertaining an apparent signature, which we believe means that the processor will determine the presence of a signature to an acceptable level of certainty, they've decided instead to focus on the word apparent signature as if that is a claim term, as if an apparent signature is a type of signature, and then raise issues about what it means to be apparent. The fact is that an apparent signature in isolation is not a term to be construed. It's to be construed in the context of the entirety of the term. And in that case, an apparent signature doesn't identify some undefined type of signature. What it does, the apparent in that claim term identifies the fact that the bank is not going to be able to determine 100% whether a certain mark is a signature. So you're saying what's covered within that element is anything that any bank does to satisfy itself that there's a signature on the line. That is correct. So that could be from some bank which says, well, if I see a dot on the signature line, that's sufficient, to the bank that says that, no, we have much more sophisticated exam. That's correct. So you've not detailed anything in the claims in terms of a public notice function for what's covered there other than anything a bank does satisfies this, right? Yes, Your Honor. It's a broad claim. I'm not saying that that is not broad. If a bank wants to bother to validate a signature field to find just a dot and say that's a signature, that would be a very strange thing for a bank to do. So you're claiming the result where you're saying this claim encompasses anything that any bank does to get to a particular result is infringing on this claim, right? Well, that might be a little broader than what I intend. I intend to say that as long as the processor, like in the 948 patent, is configured to ensure the check is signed, then it meets the claim. However it does that, whatever technology, whatever standard it wants to use for a signature, whether it has to be typewritten or personal. So anything that gets to a conclusion that satisfies them, not satisfies any objective standard, but satisfies any individual user or bank, that would infringe the claim? Well, it's not subjective. You're claiming kind of a result. I don't know if result is the right term. But you're saying any bank that does anything to satisfy itself, whether it's essentially nothing and they just say we're not going to care about this, we're just going to mark it as done, versus somebody who has this very sophisticated system. They're all infringing on this point, on this limitation. They're infringing, but there's not a subjective standard of infringement. Why did you say yes to that? Your claim says the processor has to be configured to review the images, so it's not any bank doing anything. It's any bank having a computer system with a processor that is comparing the image. Now, the nature of the comparison doesn't have to be finely tuned to fall within the scope of your claim, but it does have to determine yes or no there is a signature here. That's right. That's why this is not subjective. You have a processor. It's been programmed to look at an image of a check, and as long as it does look at the image of a check and return whether or not the signature is present, it infringes. That's an objective standard. One can discover by looking at any ATM, its documentation, its source code, whatever, that it does, in fact, ascertain an apparent signature as required by the claim. Why don't you move on to the second indefinite? The issue of transactional operator, that is found in Claim 15 of the 625 patent. The transactional operator simply refers to a computer that a person can use at an ATM in order to conduct a transaction. Does it include the buttons that are on the ATM machine itself? Yes. Does it include the display screen? No. It includes the buttons and it includes the computer and the processor and the software that's running on the ATM. The fact that it took you that long to answer the question sort of suggests, doesn't it, the ambiguity in the term and precisely what the specification discloses that it covers. Looking at the specification at Appendix 139, and specifically at Column 8, Lines 43 through 56, there is an embodiment here of a computer that's operated by a user to perform a transaction. It includes a keyboard. It includes a computer, a processor, relevant software, et cetera. So that's an example in the specification of a computer that's used by a user in order to perform a transaction. How do you know that the transactional operator corresponds to what's disclosed in Columns 9 and 10 here? The word transactional operator isn't a word that's commonly used, right? That's correct. We have looked at the entirety of the claim term, a transactional operator for operation by the user to perform a transaction. Then we've gone to the specification to see whether the inventor provided any guidance as to how it would define the transactional operator, what it is that is disclosed in the ATM that corresponds to it. Right. And why do you think Columns 9 and 10 do that? Because it provides the keyboard for the user to operate. It's a transactional operator, so it includes a keyboard, and it includes the logic behind the keyboard, the computer itself, which allows the user to then cause transactions to be completed, to be executed by the ATM. So it fulfills the requirements for a transactional operator. When I looked at the claim construction that you proposed to the district court, I didn't see anything about the buttons in there. You just said it sounded as if you were arguing that it was the processor alone. I know that the construction that we offered was of a computer. I must admit I don't recall the specifics of what the argument was before the district court orally, but it's our point of view that while transactional operator is not a commonly used term, that at least the patentee has provided enough information regarding this computer to indicate that it is, in fact, the computer in the ATM, including the keyboard that fulfills and that is sufficient disclosure of the transactional operator to avoid an indefiniteness problem. Okay. You've used up most of your rebuttal. We still have two minutes of rebuttal. Thank you. Thank you, Your Honor. I'll begin with the ascertaining apparent signature. The word apparent means that infringing ATMs must not only identify actual signatures, but the ATMs must also be capable of identifying, as Kapsik puts it, marks that appear to be a signature. There's no dispute on this point. And the problem is there's no objective measure anywhere in the patent as to what makes a signature appear to be a signature. Kapsik agrees. At page 19 of their brief and just now in argument, they said that's not part of the claim, but that's an essential part of the claim because there's no way to have objective scope of the claim ascertaining an apparent signature unless there's an objective boundary as to what it means to ascertain an apparent signature. So the problem here is one of public notice. There's no way for an ATM manufacturer to know what ATMs do or are or are not capable of infringing the claim until you know what a third party banks have made the determination as to what their acceptable confidence level or acceptable parameters are. So just to use an example, going back to the earlier discussion, if an ATM manufacturer makes an ATM that has the technological capability of distinguishing whether or not there is a dot but no more on the signature line, whether or not that infringes can't be determined from the four corners of the patent. It can only be determined if you go around and survey a bank as to whether or not there being a dot on the signature line qualifies to that bank, in their view, as being an apparent signature. Another bank that might have a much higher threshold saying that a signature is only one where you can have recognizable characters with certain characteristics like capital letters and multiple words is a signature. Why does the specification have to disclose all of those various embodiments? If one of the ordinaries on the art would look at the specification and understand that there's many different ways that somebody could do this. Well, because for a machine to infringe, the machine has to be capable of ascertaining an apparent signature. The question is, what does it mean to ascertain an apparent signature? What if it includes that wide gamut running, you know, it could be anywhere from a dot to verifying that this signature is the one that's on file at the bank? Then isn't it just a broad claim? Well, no, Your Honor, because you don't know the scope of the claim until you know the decision. You don't know the scope of the claim even though it covers anything from a dot to verifying that the signature is one that's on file at the bank. There's nothing in the scope of the claim that says it goes from the dot to one that's on file at the bank. Instead, and CapSec's very clear, page 19. Okay, just for a minute. This is my hypothetical. Assuming the specification supported that interpretation, is there anything wrong with that interpretation? Is it in any way indefinite? So we don't think that does, but even assuming that it does, that still would be indefinite because there's two, this is just like, that would just be like the situation that the court addressed in the In re Walter case where there was a claim term of block-like. And the court said, well, we know that a block-like term includes things that are actual blocks, but it also includes things that aren't actual blocks that appear to be blocks. And so there's a spectrum. There's from something that's obviously not a block to something that is obviously a block. And the court said using the term block-like doesn't provide enough definiteness because you don't know where on the spectrum all of a sudden the device begins to infringe when something is not a block but sufficiently like a block to become block-like and thus trigger infringement wasn't provided in the context of the patent. There has to be, when you're talking a term of degree. So what is the question that needs to be answered? What kind of technology a particular bank uses to ascertain it or what result the bank is seeking to satisfy itself that this is an impaired signature? I think it may well be both, Your Honor, but it's certainly the latter. Because in order to have a definite balance on what it means to appear to be a signature, one who is trying to understand what the patent covers must know what kind of technology has the capability of ascertaining what is a parent signature or not. So there has to be a way to know whether or not a dot on the check is going to be deemed an apparent signature or not. And there's no way looking at the patent to make that determination. And again, CapSec agrees with this. CapSec says... Maybe that goes to enablement or written description, but I don't see how that goes to indefiniteness. I think, again, Your Honor, it's just like the court in Ray Walters, in Datomize, and all these other cases where the court says you can't have a subjective determination by a third party that then bears on claim scope. And that's exactly what would happen here. Because if no bank says the dot is ascertaining an apparent signature, then a machine that can identify a dot but nothing else doesn't infringe. You can't answer the infringement question until you know what a third party bank has made the subjective determination as to what the requirements are or what they think an apparent signature is. What this claim language, as CapSec has interpreted, is it is an apparent signature to a bank or as it appears to a bank. There's no guidance in the claim that puts boundaries as to what a bank might determine an apparent signature to be. So again, this is consistent with Datomize and interval licensing where the court says we can't turn over claim scope to third party determinations. And it's entirely consistent with the courts that look to terms of degree that say when we're on a spectrum, when we're looking at something that is not 100% but not 0%, there has to be, for the public notice function, a fence put around. What is actually within the claim scope and what's without the claim scope? And that's just not done here. And again, CapSec doesn't see it differently. They agree that you can't figure out claim scope until you figure out what a bank has determined their acceptable confidence level or their parameters are. Because if no bank, as I said, thinks the dot is a signature, a machine that can identify the dot doesn't infringe. There's additionally no extrinsic evidence anywhere that suggests that there's any kind of objective standard and, as we said, I think this is the exact same problem that the court dealt with in Datomize, in interval licensing, and the same problem the courts looked at in Wright-Walter. And I think all of those cases show quite clearly why the public notice function here is just not done. As I opened the example with, one who sets out to make an ATM just won't know which ATMs do and don't infringe until they know what a decision a bank has made and the decision a bank makes could change at some point in the future. So it just fails the public notice function. I'll turn to the transactional operator. The term transactional operator, as we described in the brief, as we understand it, there can only be three ways to provide transactional operator definite structure. One would be if, using the traditional tools, transactional operator either had a plain meeting or there's intrinsic or extrinsic evidence that bared on it, or if the function required or mandated particular kinds of structure, or if there was a means plus function analysis, which CAPSEC has disclaimed in the reply brief and will accept them at their word on that. But as to the first, there's nothing in the plain language of transactional operator that provides any structure. There's nothing in the intrinsic record. The words transactional operator is not used anywhere. The word operator is used by itself, but it refers to an individual, which is not their construction of this term, and there's just no intrinsic evidence. In terms of the recited function, there's nothing about the function that defines anything that would require a particular structure. And to the Court's earlier question as to how CAPSEC can go about picking which of the hardware qualifies as the transactional operator and which doesn't, we think that the goods dispensing transaction is a particularly good example. So at column 21 of the specification, for example, the patent describes the purchasing lottery tickets or stamps using a machine, and the various hardware it recites to make these purchases includes a general-purpose computer. It also includes the keypad buttons, the display screens, as well as a goods dispenser unit, and the goods dispenser unit has certain security controls. The patent identifies the Asahi Seiko USA model CD-1000 as a potential goods dispenser unit. But there's no basis that CAPSEC has offered as to why the general-purpose computer is in for the transactional operator, but the goods dispenser unit is out. And it would seem that the goods dispenser unit is just as important as the general-purpose computer. There's no way to know what qualifies as the transactional operator, and CAPSEC's taking the position that it's not in this other hardware. It's only general-purpose computer. When I looked at the specification, I was thinking that perhaps the keypads 26 and 27 were the transactional operator because they're described in the specification as operating the transaction options. How do you respond to that, other than the fact that that's not what seems to have been argued by the patent? Your Honor, I think that could be a construction. That's sensible, but that's not what CAPSEC has pointed to as the transactional operator. They think it's the computer, and this is exactly Dr. Chatterjee's analysis. You can look at the keypad, you can look at the computer, you can look at the goods dispenser, and you don't know which of these it is. And that's where the district court said, I don't know which of these various pieces of hardware actually corresponds to the transactional operator. But even if it were the general-purpose computer, as CAPSEC contends, for them to be able to claim that the general-purpose computer is the device that operates as the transactional operator, I think the court's case law is pretty clear that they have to be able to point to an algorithm that is programmed on the general-purpose computer, such that it becomes a special-purpose computer for the purposes of the transactional operator. Nowhere in any of their briefs, though, have they pointed us to any algorithm that would convert this general-purpose computer into a special device that makes it the transactional operator. Certainly not done in any of their briefs, and they can't now try to identify any kind of algorithm. They're not relying on 112.6 anyway, right? They're not, Your Honor, but if they're not relying on 112.6, it's hard for us to see how they can point to the general-purpose computer. Because the analysis that they've given is to say, we're going to look at the function that the transactional operator performs, we're going to look to see where that function is in the specification, and then back out and see what structure corresponds to that function. Giving them the benefit of the doubt. I think they're trying to say that in the claim, you see transactional operator, and in light of columns 9 and 10 in the specification, you should understand that that term is referring back to... But, Your Honor, that is, in essence, a 112.6 argument. Without calling it a 112.6 argument, they want to get the benefit of getting the 112.6 analysis without paying the price of being limited to that disclosed hardware. And our submission says it just doesn't work. They can't do a 112.6 analysis, not use the label, and therefore avoid having to pay the price. That's what their analysis is, but yet they've disclaimed relying on precisely that. So we think that's reason enough to reject their contention on transactional operator. I'd be happy to answer your questions. Thank you. I think NCR has, in terms of the ascertaining an apparent signature, confused the issue of what standard a bank may use to decide whether there's a signature on a check to whether the claim is clear as to whether a bank would infringe the claim by trying to detect the presence of a signature on a check. There's no question that, what standard a bank uses for finding a signature, whether it requires characters or just a line or two, the fact is as long as that bank has configured its ATM to look for a signature and infringes the claim, that is definite. There's no question that one of ordinary skill would be able to determine whether the bank has taken the image of the check, is looking at the signature field, is looking for content, and makes a determination as to whether a signature is present. That seems to me to be completely objective and there shouldn't be an issue regarding whether that ascertaining an apparent signature is in fact definite. We note that in the claim construction process, the district court looked at the same intrinsic evidence that we refer to in our appeal and actually provided a construction of this claim term. The district court said that ascertaining an apparent signature is to discover the presence of a person's cursive signature in the signature field. We disagree with the cursive part because we believe a signature and we believe the evidence is that, and in fact the district court agreed in its opinion that signatures can be cursive or not, but this indicated that the court was able to look to the intrinsic record to provide a construction at the time. We think that while it's not exactly the same as the construction that we had proposed, it is acceptable notwithstanding, assuming that we could excise the cursive portion. But to appreciate that our case law doesn't require, I mean your argument can't be that because the district court in connection with the marking has hesitation but comes up with some construction that he's precluded later on from then calling it indefinite. Yes, Your Honor. We don't say that simply because the court construed the claim that therefore it is not indefinite. We are saying, however, that this construction is on its face definite. It leaves no question as to what ascertaining an apparent signature is. And so it appears that if the court is able to look at the intrinsic record and the court is able to provide a clear and definite construction of the term, then that would seem to go a long way to show that this is in fact a definite term. Thank you very much. We thank both sides in this case.